UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
SAN ANGELO DIVISION

| | |
|---|---|
| EDWIN L. LACKEY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. |
| ) | 6:10-CV-00098-BG |
| ) | ECF |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

### Statement of the Case

Pursuant to 42 U.S.C. §§ 405(g) and 1383(c), Plaintiff Edwin L. Lackey seeks judicial review of a decision of the Commissioner of Social Security denying his application for disability insurance benefits and supplemental security income. The United States District Judge transferred this case to a United States Magistrate Judge for further proceedings.

An Administrative Law Judge (ALJ) held a hearing on November 18, 2008, and determined on August 28, 2009, that Lackey was not disabled. Specifically, the ALJ held that Lackey had the residual functional capacity (RFC) to perform a full range of work with certain non-exertional limitations and could therefore perform jobs that existed in significant numbers in the national economy during the relevant time period. The Appeals Council denied review on August 27, 2010. Therefore, the ALJ's decision is the Commissioner's final decision and properly before the court for review. *See Higginbotham v. Barnhart*, 405 F.3d 332, 334 (5th Cir. 2005) (holding that the Commissioner's final decision "includes the Appeals Council's denial of [a claimant's] request for

1

review").

**Factual Background**

Lackey previously worked as an oilfield and ranch foreman, warehouse supervisor, and hydraulics supervisor, among other jobs. (Tr. 139.) He claims that he became disabled on August 15, 2006, due to mental illness. (Tr. 138.) Around that time, he quit his last job because he felt too much pressure. (Tr. 27–28.)

On February 26, 2007, a physician's assistant examined Lackey for his mood swings, diagnosed him with possible bipolar disorder with episodes of mania and depression, and prescribed medication. (Tr. 181.) A mental health professional at Hill Country Community MHMR Center screened Lackey for services on April 27, 2007. (Tr. 265–67.) Lackey reported that he had become very sad and suicidal since losing his job and that he had been let go because he did not complete treatment after his employer claimed his urinalysis (UA) tested positive for drug content. (Tr. 265.) Lackey also stated that he had last used methamphetamine two months prior. (Tr. 267.)

James Johnson, M.D. was Lackey's treating psychiatrist from May 2007 to at least May 2008. (Tr. 29, 209, 247, 291.) On May 3, 2007, Dr. Johnson conducted a psychiatric evaluation of Lackey and diagnosed him with major depression and amphetamine dependence. (Tr. 188–91.) According to Dr. Johnson, Lackey reported that he was not happy with life, did not like people, had been using methamphetamine heavily to keep up at work for the past three years, and was fired from his job due to a dirty UA. (Tr. 188–89.) Dr. Johnson prescribed and adjusted medications for Lackey throughout the course of his treatment. (Tr. 191–207, 235–43, 246–51.)

Lackey's symptoms improved incrementally during his time as Dr. Johnson's patient. (Tr. 188–207, 238–43, 246–51.) At an appointment on May 10, 2007, Dr. Johnson noted that the degree

of Lackey's present symptoms ranged from 6 to 8 on a scale of 0 to 10, with 0 indicating no symptoms and 10 indicating extreme symptoms. (Tr. 206.) He also rated Lackey's overall functioning at 6 out of 10 and side effect severity at 5 out of 10. *Id.* On June 20, 2007, Dr. Johnson opined that Lackey had been "too mentally disabled to work" since May 3, 2007. (Tr. 291.) Approximately one year later, Dr. Johnson found that the degree of Lackey's present symptoms ranged from 2 to 6 out of 10, though his overall functioning remained at 6 out of 10. (Tr. 246.) Dr. Johnson expected Lackey to be stable on medication and stated that he was "hopefully improving." (Tr. 247.) Throughout the course of treatment, Dr. Johnson consistently found that Lackey displayed clear sensorium, intact memory, average intelligence, logical thought processes, and fair or good concentration. (Tr. 190–207, 238–43, 246–51.)

On August 5, 2007, Lackey submitted a Daily Activity Questionnaire in connection with his application for benefits. (Tr. 153–57.) He reported that he could not think clearly, did not like to be around people, lacked concentration, and was forgetful. (Tr. 153.) In addition, he stated that he straightened the house, did laundry, fished, and took naps on an average day. (Tr. 154.) He also reported that he helped his wife with cooking, drove, and took care of his dog, cats, and bird. (Tr. 154–55.)

On November 14, 2007, consulting psychologist William A. Montgomery, Ph.D. examined Lackey in connection with his application for benefits. (Tr. 208–15.) Lackey's wife was present and assisted at the examination. (Tr. 208.) According to Dr. Montgomery, Mrs. Lackey reported that her husband's anger had improved, but he was clumsier and more forgetful since starting medication. (Tr. 209.) Contrary to Lackey's statements to Dr. Johnson and the MHMR screener approximately six months prior, Lackey told Dr. Montgomery that he had not used

3

methamphetamine in the past five years. (Tr. 188, 211, 267.) According to Dr. Montgomery, Lackey stated that his typical day involved driving his son to school and wife to work; doing household chores including washing dishes, vacuuming, and mopping; taking naps, and picking up his son from school and wife from work. (Tr. 209.) Lackey also stated that he played golf and went fishing approximately once per month, had good relationships with his wife and son, and related "OK" with his other children. (Tr. 209–11.) Additionally, he indicated that he had memory problems on a daily basis. (Tr. 210.) Dr. Montgomery found that Lackey's recent and remote memory were intact, but his immediate memory was impaired. (Tr. 213.) Dr. Montgomery also found that Lackey's attention and concentration were adequate, and he appeared to function at the low average range of intelligence. *Id.* Dr. Montgomery concluded that Lackey required more intensive treatment than he was receiving; he also recommended a neuropsychological evaluation for his reported memory problems and history of methamphetamine abuse. (Tr. 214.)

On November 30, 2007, State agency medical consultant (SAMC) Robert B. White, Ph.D. reviewed Lackey's medical records to evaluate his psychiatric condition in connection with his application for benefits. (Tr. 216–32.) Dr. White found that Lackey had depressive syndrome, paranoid personality disorder, and a history of substance abuse. (Tr. 219, 223–24.) In addition, he found that these conditions caused Lackey no restrictions in activities of daily living; moderate difficulties in maintaining social functioning and concentration, persistence, or pace; and one or two episodes of decompensation of extended duration. (Tr. 226.) Dr. White also found that he was moderately limited in eleven of twenty categories but otherwise not significantly limited. (Tr. 230–31.) He also noted that Lackey's global assessment of functioning (GAF) score was 50. (Tr. 228.) Dr. White concluded that the evidence of record did not "reflect a degree of mental/emotional

4

signs or symptoms that work related abilities/activities would be significantly/consistently compromised." *Id.* In particular, he noted that Lackey's history of substance abuse was "at significant variation" from the history he gave at his consultative exam with Dr. Montgomery and raised considerable credibility issues. *Id.* Dr. White further concluded that Lackey could understand, remember, and carry out detailed but not complex instructions; make decisions; attend and concentrate for extended periods; accept instructions; and respond appropriately to changes in a routine work setting. (Tr. 232.) SAMC Charles Lankford, Ph.D. affirmed Dr. White's assessment on February 26, 2008. (Tr. 244.)

On February 8, 2008, Lackey submitted another Daily Activity Questionnaire. (Tr. 164–68.) He reported that he could not finish projects, became angry easily, lacked concentration, and was forgetful. (Tr. 164.) He stated that he drove his son to school, washed dishes, did laundry and other housework, checked the mail, and took a nap on an average day. (Tr. 165.) He also reported that he drove in town, took care of his pets, golfed, fished, and went to church at least three times a month. (Tr. 166–67.)

On November 18, 2008, Lackey, his wife, and a vocational expert testified at a hearing before the ALJ. (Tr. 17–51.) Lackey was represented by counsel at the hearing. (Tr. 17.) Lackey testified that he could not work because he did not like to be around people and had memory problems. (Tr. 27.) He also stated that he was clumsy. (Tr. 36.) Lackey further testified that he quit his last job because he felt too much pressure; he specifically denied having problems with his co-workers and stated that the vice president of that company loved him. (Tr. 27–28.) In addition, he stated that he held two temporary jobs after the alleged date of onset of his disability. (Tr. 22–23.) Lackey stated that the first job was in lawn service, but he quit after two weeks mainly

5

because he did not care for his boss. (Tr. 23.) Lackey testified that the other reason that he quit that job was that he did not function well in heat due to a medication he was taking. *Id.* Lackey stated that the second job was construction work for his neighbor, which also lasted about two weeks. (Tr. 24.) Lackey also testified that he sometimes helped out and mowed the lawn at a friend's ranch in exchange for hunting and fishing rights. (Tr. 30–31.) He further stated that he enjoyed fishing and playing rounds of golf and sometimes did those activities with a friend or family member. (Tr. 30–32.) Lackey's wife testified that he did dishes, laundry, and other housekeeping tasks; picked up items on a list from stores for her; and drove in town. (Tr. 40–41.) She also stated that he had problems handling money responsibly. (Tr. 42.)

## **Standard of Review**

A plaintiff is disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3) (2011).

"In evaluating a disability claim, the Commissioner conducts a five-step sequential analysis to determine whether (1) the claimant is presently working; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment listed in appendix 1 of the social security regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the impairment prevents the claimant from doing any other substantial gainful activity." *Audler v. Astrue*, 501 F.3d 446, 447–48 (5th Cir. 2007); *see also* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2011). "The claimant bears the burden of showing she is disabled through the first four steps of the analysis; on the fifth, the Commissioner must show that there is other substantial

6

work in the national economy that the claimant can perform." *Audler*, 501 F.3d at 448. Before proceeding to steps 4 and 5, the Commissioner must assess a claimant's RFC, defined as "the most [a claimant] can still do despite [his] limitations." 20 C.F.R. §§ 404.1545(a)(1), 404.1520(a)(4)(iv)-(v), 416.945(a)(1), 416.920(a)(4)(iv)-(v).

Judicial review of a decision by the Commissioner is limited to two inquiries: a court must "consider only whether the Commissioner applied the proper legal standards and whether substantial evidence in the record supports the decision to deny benefits." *Audler*, 501 F.3d at 447; 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]"). "Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir. 2002). "Conflicts in the evidence are for the [Commissioner] and not the courts to resolve." *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990).

## **Discussion**

Lackey argues that the ALJ did not apply the proper legal standard to determine whether his impairments were severe. (Pl.'s Br. 6–9.) In addition, he argues that the ALJ should have included moderate limitations in concentration, persistence, and pace in his RFC and in the hypothetical question posed to the vocational expert. (Pl.'s Br. 11–13.) He further argues that the ALJ did not comply with regulations governing Social Security claims when evaluating certain medical source opinions. (Pl.'s Br. 9–11.)

I.  The ALJ applied the proper legal standard to determine whether Lackey's impairments were severe.

Pursuant to the regulations governing Social Security claims, a combination of impairments is not severe "if it does not significantly limit [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1521(a), 416.921(a). In *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985), the Court of Appeals for the Fifth Circuit reaffirmed that an impairment is not severe under this regulation only if the impairment "is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." *Id.* at 1101 (quoting *Estran v. Heckler*, 745 F.2d 340, 341 (5th Cir. 1984)) (alteration in original). The court also stated that it would assume that the ALJ applied an incorrect severity standard "unless the correct standard is set forth by reference to [*Stone*] or another [opinion] of the same effect[.]" *Stone*, 752 F.2d at 1106. The following year, the court clarified that a case "will not be remanded simply because the ALJ did not use [*Stone*'s] 'magic words'" and should be remanded only where there is no indication that the ALJ applied the correct standard such as when the ALJ relies solely on the language of the regulations. *Hampton v. Bowen*, 785 F.2d 1308, 1311 (5th Cir. 1986).

In the instant case, Lackey applied for benefits solely on the basis of his mental impairments. (Tr. 138.) The ALJ found that Lackey had the impairments of affective disorder and personality disorder, which were severe in combination. (Tr. 11.) Citing *Stone* and other sources, he reasoned that "the combination of those impairments significantly causes more than a minimal effect on his ability to perform basic work-related activities." *Id.* Although this statement does not use the "magic words" from *Stone*, the ALJ's opinion indicates that he applied the correct standard. In addition to referencing *Stone*, the ALJ specified the ways in which Lackey's mental impairments

8

would be expected to interfere with his ability to work by including non-exertional limitations in his RFC. *See* 20 C.F.R. §§ 404.1545(a)(4), 416.945(a)(4) (stating that RFC assessment includes consideration of a claimant's ability to meet the mental requirements of work). Specifically, the ALJ found that Lackey was limited to performing jobs with a reasoning development level of 1 or 2 and could have no more than superficial contact with the public, supervisors, and co-workers. (Tr. 12.) These limitations indicate that the ALJ found that Lackey's combination of mental impairments were more than "a slight abnormality" and would "be expected to interfere with [Lackey's] ability to work[.]" *Stone*, 752 F.2d at 1101 (quoting *Estran*, 745 F.2d at 341). Because the ALJ's opinion indicates that the correct standard was applied, remand is not required. *See Hampton*, 785 F.2d at 1311.

II.     Substantial evidence supports the ALJ's RFC assessment, including his decision not to include moderate limitations for concentration, persistence, or pace.

As defined in the Dictionary of Occupational Titles (DOT), jobs with reasoning development level 1 require the ability to apply commonsense understanding to carry out simple one- or two-step instructions and deal with "standardized situations with occasional or no variables in or from these situations encountered on the job." Dictionary of Occupational Titles app. C at 1011 (4th ed. 1991). Jobs with reasoning development level 2 require the ability to apply commonsense understanding to carry out detailed but uninvolved written or oral instructions and deal with "problems involving a few concrete variables in or from standardized situations." *Id.*

In the instant case, the ALJ found that Lackey had the RFC to perform a full range of work at all exertional levels except that he was limited to jobs with a reasoning development level of 1 or 2 and could have no more than superficial contact with the public, supervisors, and co-workers. (Tr. 12.) The following substantial evidence supports this conclusion: Lackey's treating physician,

9

Dr. Johnson, regularly found that Lackey displayed clear sensorium, intact memory, average intelligence, and logical thought processes. (Tr. 190–206, 238–42, 246–50.) Dr. Johnson also thought that Lackey would be stable on medication. (Tr. 247.) Dr. Montgomery found that Lackey was cooperative and functioning at the low average range of intelligence; he also found that Lackey's remote and recent memory was intact. (Tr. 212–13.) Dr. White found that Lackey could understand, remember, and carry out detailed but not complex instructions; make decisions; attend and concentrate for extended periods; accept instructions; and respond appropriately to changes in a routine work setting. (Tr. 232.) Lackey reported getting along with his wife, three children, and others, including his neighbor and a ranch owner for whom he did yard work in exchange for fishing and hunting rights. (Tr. 24, 30–31, 210–11, 290.) Lackey and his wife also reported that he regularly straightened the house; did laundry; helped with cooking; washed dishes; vacuumed; mopped; took care of his dog, cats, and bird; drove his wife and son to and from work and school; picked up items on a list from stores; golfed and fished, sometimes with a friend or family member; and went to church at least three times per month. (Tr. 31–32, 40–41, 154–55, 165–67, 209.) He also testified that he had no problems with his co-workers at his last job and that the vice president of his company loved him. (Tr. 28.)

Substantial evidence also supports the ALJ's decision not to include moderate limitations for concentration, persistence, or pace. Lackey's treating psychiatrist consistently found that he displayed fair or good concentration. (Tr. 196–206, 238–42, 246–50.) Dr. Montgomery found that Lackey's attention and concentration were adequate. (Tr. 213.) Dr. White found that Lackey could "attend and concentrate for extended periods[.]" (Tr. 232.) Lackey indicated that he regularly played rounds of golf, an activity that requires concentration, persistence, and pace. (Tr. 31–32, 167,

209.) Lackey also testified that he worked two temporary jobs, each lasting approximately two weeks, since the onset of his alleged disability. (Tr. 22–24.) Neither job ended because of problems with concentration, persistence, or pace. *Id.*

Lackey argues that the ALJ's decision not to include moderate limitations for concentration, persistence, or pace is inconsistent with his finding at steps 2 and 3 that Lackey was so limited. (Pl.'s Br. 12.) The ALJ explained that the limitations he found at those steps were "not a residual functional capacity assessment but [were] used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process." (Tr. 12.) Furthermore, in view of the previously described substantial evidence, any alleged inconsistency in the ALJ's findings does not require remand because it did not affect Lackey's substantial rights. *Slaughter v. Sec'y of Health & Human Res.*, 22 F.3d 1093 (5th Cir. 1994) (upholding ALJ's decision despite internal inconsistencies because the "inconsistency complained of did not affect [the claimant's] substantial rights") (per curiam) (not selected for publication).

III.  The hypothetical question posed to the vocational expert was appropriate.

An ALJ may rely on the testimony of a vocational expert to determine whether jobs exist in the national economy that a claimant can perform. *See Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir. 1995) (holding that substantial evidence supported ALJ's determination that jobs available to claimant existed in the national economy because vocational expert testified to that effect and explained how he arrived at his conclusions). When an ALJ bases a determination of non-disability on the testimony of a vocational expert in response to a hypothetical question, the hypothetical question is defective and constitutes reversible error if either of the following is true:

> 1.  The hypothetical question did not incorporate reasonably all disabilities of the claimant recognized by the ALJ, or

11

> 2. The claimant or his representative was not afforded the opportunity to correct deficiencies in the ALJ's question by mentioning or suggesting to the vocational expert any purported defects in the hypothetical question (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question).

*See Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).

In the instant case, the ALJ asked the vocational expert if jobs existed in significant numbers in the national economy that could be done by someone with Lackey's age, education, and work history, who could perform a full range of work physically but was limited to jobs with a reasoning development level of 1 or 2 and could have no more than superficial contact with the public, supervisors, and co-workers. (Tr. 43–44.) The vocational expert responded that someone with those limitations could perform, for example, the jobs of dish washer, laundry worker, and cleaner. (Tr. 44.) The expert further testified that there were 16,000 dish washers in Texas and 240,000 in the national economy, 3000 laundry workers in Texas and 40,000 in the national economy, and 19,000 cleaners in Texas and 260,000 in the national economy. *Id.* Lackey's attorney then questioned the vocational expert extensively about the type of contact an individual would have with co-workers and supervisors in those three jobs. (Tr. 45–50.) In response to the questioning, the vocational expert testified that a person in those jobs would have no more than incidental contact with co-workers in that the person would visually observe others working around him but would not need to work or communicate with those individuals to complete the work project at hand. *Id.* Lackey's attorney also asked the vocational expert whether concentration difficulty or getting into confrontation two or three times per day would affect the hypothetical individual's ability to retain the identified jobs. (Tr. 50.) The vocational expert answered, "It certainly could if you're having

conflicts with co-workers two or three times a day, yes, it would. If you [are] having lapse of concentration, it could impact your productivity, whether or not you're able to complete the task." *Id.*

The ALJ found that Lackey had the impairments of affective disorder and personality disorder, which were severe in combination. (Tr. 11.) The ALJ accounted for these impairments when he predicated the question posed to the vocational expert on Lackey's RFC. (Tr. 12, 43–44.) As previously discussed, substantial evidence supports the ALJ's RFC assessment. Furthermore, Lackey's attorney was given the opportunity to suggest any purported defects in the ALJ's question, and the attorney used that opportunity to question the vocational expert extensively and pose a hypothetical question that included additional limitations. (Tr. 45–50.) Accordingly, the ALJ's hypothetical question was proper and does not constitute reversible error. *See Bowling*, 36 F.3d at 436.

IV. Lackey's arguments regarding the ALJ's treatment of certain medical source opinions do not require remand.

    A.    Dr. Johnson's opinion

Lackey asserts that the ALJ did not comply with the governing regulations when considering Dr. Johnson's opinion that Lackey was "too mentally disabled to work[.]" (Pl.'s Br. 9–10.) Regarding Dr. Johnson's opinion the ALJ stated, "I cannot accord probative weight to the opinion of Dr. James Johnson . . . that the claimant is disabled. Pursuant to SSR 96-2p, the determination of disability is reserved to the Commissioner." (Tr. 14.) This reasoning comports with applicable law and therefore does not provide a basis for remand. *See* 20 C.F.R. §§ 404.1527(e), 416.927(e) (stating that opinions on issues reserved to the Commissioner, including opinions by medical sources that a claimant is disabled or unable to work, are not entitled to any special significance); *Frank v.*

13

*Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003) (holding that ALJ need not consider six factors of 20 C.F.R. § 404.1527(d) when evaluating treating physician's opinion on issue reserved to Commissioner).

### B. Dr. Montgomery's report

Lackey argues that the ALJ did not comply with governing regulations when considering the report of consulting physician Dr. Montgomery that Lackey could not handle his funds and had a global assessment of functioning (GAF) score of 50. (Pl.'s Br. 9–10.) The regulations require an ALJ to evaluate every medical opinion received. 20 C.F.R. §§ 404.1527(d), 416.927(d). An ALJ should consider six factors when weighing medical opinions unless he assigns controlling weight to a treating source. 20 C.F.R. §§ 404.1527(d), 416.927(d). These factors include the length, frequency, and nature of the relationship between the source and the claimant; the extent to which the opinion is supported with relevant evidence and consistent with the record as a whole; and the specialty of the source, if any. 20 C.F.R. §§ 404.1527(d), 416.927(d).

In general, "where the rights of individuals are affected, an agency must follow its own procedure, even where the internal procedures are more rigorous than otherwise would be required." *Hall v. Schweiker*, 660 F.2d 116, 119 (5th Cir. 1981). However, the Court of Appeals for the Fifth Circuit requires "a showing that the claimant was prejudiced by the agency's failure to follow a particular rule before such a failure will be permitted to serve as the basis for relief from an ALJ's decision." *Shave v. Apfel*, 238 F.3d 592, 597 (5th Cir. 2001). Thus, an ALJ "is not always required to do an exhaustive point-by-point discussion" to comply with a regulation. *Audler*, 501 F.3d at 448. Procedural perfection is not required "as long as 'the substantial rights of a party have not been affected.'" *Id.* (quoting *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988). Accordingly, alleged

improprieties in Social Security administrative proceedings "constitute a basis for remand only if such improprieties would cast into doubt the existence of substantial evidence to support the ALJ's decision." *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988).

Although the ALJ did not reference the details in Dr. Montgomery's report, he stated that he "considered the information and observations provided by the claimant's . . . consultative physician" in accordance with the governing regulations. (Tr. 14.) Dr. Montgomery's report largely duplicated information contained elsewhere in the record, such as Lackey's allegations of memory problems, clumsiness, depression and mood swings, general dislike of people, quitting jobs, and inability to handle money responsibly. (Tr. 27–29, 36, 40–42, 138, 153, 164, 209–12, 289.) Similar to Dr. Johnson, Dr. Montgomery found that Lackey was functioning at the low average range of intelligence, his attention and concentration were adequate, and his recent and remote memory were intact (although his immediate memory was impaired). (Tr. 213, 246–50.) Lackey's GAF scores were also included elsewhere in the record. (Tr. 187, 191, 228.)

"The ALJ is not required to recite every [piece] of evidence which the claimant considers helpful to her case." *Hall v. Barnhart*, 31 F. App'x 839 (5th Cir. 2002) (per curiam). "That the ALJ did not specifically cite each and every piece of medical evidence considered does not establish an actual failure to consider the evidence." *Castillo v. Barnhart*, 151 F. App'x 334, 335 (5th Cir. 2005) (per curiam). Furthermore, in view of Lackey's activities of daily living and the other evidence described in Section II above, the GAF score and Lackey's alleged inability to handle money does not "cast into doubt the existence of substantial evidence to support the ALJ's decision." *Morris*, 864 F.2d at 335. Accordingly, remand is not required.

    C.    <u>Opinion of state agency medical consultants (SAMCs)</u>

15

Lackey asserts that the ALJ did not comply with Social Security Ruling 96-6p when considering the opinion of SAMCs Dr. White and Dr.Lankford that Lackey was moderately limited in certain vocational categories. (Pl.'s Br. 10–11.) Social Security Ruling 96-6p provides that ALJs "are not bound by findings made by State agency or other program physicians and psychologists, but they may not ignore these opinions and must explain the weight given to the opinions in their decisions." SSR 96-6p, 1996 WL 374180 at *2 (July 2, 1996).

Dr. White found that, despite Lackey's limitations, the evidence of record did not "reflect a degree of mental/emotional signs or symptoms that work related abilities/activities would be significantly/consistently compromised." (Tr. 228.) In particular, he noted that Lackey's history of substance abuse was "at significant variation" from the history he gave at a recent examination with a consulting physician and raised considerable credibility issues. *Id.* Dr. White further concluded that Lackey could understand, remember, and carry out detailed but not complex instructions; make decisions; attend and concentrate for extended periods; accept instructions; and respond appropriately to changes in a routine work setting. (Tr. 232.) Dr. Lankford reviewed all the evidence on file and affirmed Dr. White's assessment on February 26, 2008. (Tr. 244.) Regarding these opinions the ALJ stated, "I have considered and concur with the administrative findings of fact made by the State agency medical physicians . . . that the cumulative adverse effects of the combination of the claimant's impairments do not preclude him from the ability to perform all work." (Tr. 14.) Thus in accordance with Social Security Ruling 96-6p, the ALJ neither ignored the opinion of the SAMCs, nor did he fail to explain the weight given to that opinion. SSR 96-6p, 1996 WL 374180 at *2 (July 2, 1996). Furthermore, any alleged procedural impropriety in this regard does not "cast into doubt the existence of substantial evidence to support the ALJ's decision"

for the reasons explained in Sections II and III above. *Morris*, 864 F.2d at 335. Accordingly, remand is not required.

## Conclusion

For the foregoing reasons, the undersigned recommends that the United States District Court **AFFIRM** the Commissioner's decision and **DISMISS** Lackey's complaint with prejudice.

A copy of this Report and Recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this report and recommendation must file specific written objections within fourteen days after being served with a copy. *See* 28 U.S.C. § 636(b)(1) (2011); Fed. R. Civ. P. 72(b). To be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's Report and Recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

Dated:     January 19, 2012.

_____
NANCY M. KOENIG
United States Magistrate Judge

17